## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**KIMBERLY KENNEY**                                                    **PLAINTIFF**

**v.**                          **Case No. 4:18-cv-00882-KGB**

**THE BOARD OF TRUSTEES OF**
**UNIVERSITY OF ARKANSAS,**
**a body of politic and corporate**                                    **DEFENDANT**

### ORDER AND OPINION

Before the Court is a motion for summary judgment filed by defendant the Board of Trustees of the University of Arkansas (the "University") (Dkt. No. 17). Plaintiff Kimberly Kenney has filed a response to the motion (Dkt. No. 23). The University has filed a reply to the response (Dkt. No. 26). For the following reasons, the Court grants the University's motion for summary judgment (Dkt. No. 17).

### I.      Factual Background

Ms. Kenney brings this civil rights action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*; the Fourteenth Amendment to the United States Constitution; 42 U.S.C. § 1983;[1] the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101; Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 791, *et seq.*; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq.*; and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.* (Dkt. No. 1, at 1-2). Ms. Kenney alleges four counts of unlawful employment practices against the University: (1) violation of Title VII, including discrimination based on her race and retaliation; (2) violation of the ADA and the RA,

---

[1] Though Ms. Kenney did not plead 42 U.S.C. § 1983 as a cause of action in her complaint, she states that she seeks relief under that statute in the introductory paragraph of her complaint (Dkt. No. 1).

including discrimination against her as a result of being regarded as disabled under the ADA and retaliation for having complained about discriminatory treatment based on her disability; (3) violation of the FMLA, including interfering with, restraining, or denying her rights under the act and retaliating against her for attempting to exercise her rights under the act; and (4) violation of the ADEA, including discrimination against her on the basis of her age (*Id.*, ¶¶ 24-56).  As relief, Ms. Kenney seeks in her complaint a declaratory judgment; a Court Order reinstating her employment; full front pay; full back pay; compensatory damages for the humiliation, emotional distress, and other damages caused by the University's conduct; punitive damages for the University's malicious and recklessly indifferent conduct; all employment benefits she would have enjoyed had she not been discriminated against; expenses of litigation, including reasonable attorney's fees; a jury trial; and all other relief the Court deems just and proper and to which she might be entitled (*Id.*, at 2, 10-11).  When asked in her deposition whether she wanted her job back, Ms. Kenney answered, "At this time, I don't want to answer that" and that she "[didn't] know at this time." (Dkt. No. 24, ¶ 57).

Ms. Kenney, a 52-year-old African-American female, began working at University of Arkansas at Little Rock ("UALR") in 2004 as a custodial worker in the Facilities Management Department (Dkt. No. 24, ¶¶ 1-2).  In the Fall 2011, Ms. Kenney began having problems with pain in her knees and was diagnosed with degenerative joint disease (*Id.*, ¶ 3).  Ms. Kenney claims that this condition created episodic pain flare-ups for which she requested and received the ability to take intermittent leave time under the FMLA (*Id.*, ¶ 4).  Ms. Kenney also claims that she needed regular breaks while working, and she requested and received accommodation under the ADA to take 15-minute hourly breaks (*Id.*, ¶ 5).  For both requests, Ms. Kenney's treating physician was asked to complete a medical certification form detailing the need for leave or accommodation (*Id.*,

¶ 6).  All renewals were granted (*Id.*).  Ms. Kenney remained on consecutive FMLA leave periods from her initial request in 2011 until her termination in 2018 (*Id.*, ¶ 7).

Ms. Kenney made a second request under the ADA in May 2012 for a closer parking space (*Id.*, ¶ 8).  Human Resources Director Annette Tangye told Ms. Kenney how to obtain the parking pass and informed her that she would need to provide the necessary medical certification for the request (*Id.*, ¶ 9).  Ms. Kenney was never willing to provide this information and did not receive the pass, but she did obtain a disabled parking sticker which granted her access to all lots where spaces were available (*Id.*, ¶¶ 9-10).  Her requested accommodation for breaks on the job was renewed during that same time (*Id.*, ¶ 11).

On September 12, 2014, Ms. Kenney was admonished by her supervisor to take out the trash, and on September 18, 2014, Ms. Kenney reported a back injury due to this task (*Id.*, ¶ 12).  Ms. Kenney's physician, Dr. Melnyk, requested that she be relieved from lifting anything over 25 pounds (*Id.*, ¶ 13).  The request did not state that Ms. Kenney was restricted to daytime work, though Ms. Kenney contends that she had already been given an accommodation working 8:00 a.m. to 5:00 p.m. at the Donaghey Student Center ("DSC") (*Id.*).  Because custodial services did not offer light duty positions, Ms. Kenney could not return to work in that department (*Id.*, ¶ 14).

As an accommodation for her back injury and the lifting restriction, Human Resources ("HR") began exploring other positions on campus for which Ms. Kenney might qualify (*Id.*, ¶ 15).  Ms. Kenney was initially offered a job as a "dispatcher" in the police department, which she declined (*Id.*, ¶ 75).  On September 29, 2014, HR notified Ms. Kenney that as an accommodation under the ADA she would be transferred to a position which had been specially created for her—a desk job as Security/Parking Assistant in the Police Department stationed at the DSC—effective October 16, 2014 (Dkt. Nos. 17-3, at 13; 24, ¶¶ 15, 23, 75).  Attached to the notice was a job

description listing her duties and responsibilities which included that she have "the ability to work a flexible schedule, which includes nights and weekends" (Dkt. No. 24, ¶ 16).  Ms. Kenney asserts that she was given a position at the DSC Monday through Thursday from 10:00 a.m. to 7:00 p.m. and the main police station from 8:00 a.m. to 5:00 p.m. on Friday (*Id.*).

On September 30, 2014, Ms. Kenney signed an additional agreement providing that the need for break times would be eliminated as an ADA accommodation (*Id.*, ¶ 17).  The agreement stated that any request for an alternative accommodation would need to be accompanied by appropriate medical certification and an updated ADA accommodation request form (Dkt. Nos. 17-3, at 17; 24, ¶ 17).  Ms. Kenney denies that she was required to provide updated medical documentation unless she was asking for a reassignment (Dkt. No. 24, ¶ 17).

On September 29, 2017, Ms. Kenney was granted FMLA intermittent leave for one year, to expire on September 29, 2018 (Dkt. No. 24, ¶ 22).  This renewal represented the last renewal of her FMLA leave and was in place until she left UALR in August 2018 (*Id.*, ¶¶ 18, 22).

After two years at the DSC, Ms. Kenney was moved to Stabler Hall in approximately 2016 (*Id.*, ¶¶ 25, 77).  The University maintains that Ms. Kenney was moved to Stabler Hall due to a greater need for someone staffing the front desk, but Ms. Kenney claims that there was nothing to do at the Stabler Hall job (*Id.*, ¶ 25).  During her station at Stabler Hall, Ms. Kenney was required to monitor the traffic flow in the traffic loop outside the building for a few hours (*Id.*, ¶ 26).  Chief Regina Carter[2] also worked the traffic loop when needed (*Id.*).  Chief Carter testified that there were problems, difficulties, and complaints about Ms. Kenney's performance of her Stabler Hall duties (Dkt. No. 17-2, at 11-12).

---

[2]  Chief Carter is also an African-American woman (Dkt. No. 18, at 28).

On November 30, 2017, Ms. Kenney, Employee Relations Manager Cynthia Mahan, and Patrol Commander Lieutenant Jerome F. Bailey met to discuss Ms. Kenney's complaints that her job duties were discriminatory and retaliatory (Dkt. No. 17-3, at 24-26; 24, ¶ 27). Ms. Kenney also noted her medical disabilities (Dkt. No. 17-3, at 25; 24, ¶ 27). The following day, Ms. Mayhan provided Ms. Kenney with information to file both her discrimination complaint and any request for accommodation and followed up with this information in several emails (Dkt. No. 24, ¶ 28). Ms. Mayhan emphasized that Ms. Kenney's FMLA leave was still in place but that the ADA process and FMLA process required separate documentation (*Id.*, ¶ 29). Ms. Kenney did not follow up with an employment grievance or ADA request at that time (*Id.*).

On July 11, 2018, Lt. Bailey notified Ms. Kenney that the athletics department would be taking over the police substation in Stabler Hall (*Id.*, ¶ 30). Accordingly, Ms. Kenney would be moved to the newly renovated substation located on Fair Park Boulevard, effective August 1, 2018, and assigned to the 3:00 p.m. to 11:00 p.m. shift with Sunday and Monday as her days off (*Id.*). In the interim, Ms. Kenney worked for a few weeks in a temporary station at the University Village booth (*Id.*, ¶ 31).

On July 24, 2018, Ms. Kenney emailed Chief Carter and Ms. Mayhan with a number of complaints about her new assignment (*Id.*). Ms. Kenney claimed the move was "without reasonable cause," discriminatory, and that there were "conflicts of interest and complications due to FMLA" and working a night shift (*Id.*). Chief Carter contacted Ms. Mayhan by phone, and Ms. Mayhan said she would handle the complaint per HR policy (*Id.*, ¶ 32). Other than what was contained in that email, Chief Carter had no knowledge of Ms. Kenney's accommodation request (*Id.*, ¶ 71).

Ms. Mayhan unsuccessfully attempted to reach Ms. Kenney the next day, and Ms. Kenney responded five days later on July 30, 2018 (*Id.*, ¶ 33). That same day, Ms. Mayhan emailed Ms. Kenney asking her to schedule an appointment to discuss her complaint, gave her information about the reasons for her new job assignment, and provided a link for making an accommodation request (*Id.*, ¶ 34).

On July 31, 2018, Ms. Kenney submitted an ADA accommodation request form stating that she could not drive or work at night due to the medication she was taking (*Id.*, ¶ 35). Ms. Mayhan responded and requested that Ms. Kenney submit the medical certification form as provided in the policy (*Id.*). On August 1, 2018, Ms. Mayhan emailed Ms. Kenney asking to see her when she came to drop off materials, and Ms. Mayhan sent a separate email to remind her about the supporting medical documentation needed and to arrange a meeting to discuss her complaint (*Id.*, ¶ 36). That same day, Chief Carter learned that Ms. Kenney had arrived to work at her previous shift time of 7:00 a.m. instead of 3:00 p.m. and at the University Village security booth instead of the Fair Park substation (*Id.*, ¶ 38). Lt. Bailey went to the security booth to ask Ms. Kenney why she was not reporting to her new location and shift, and he told Ms. Kenney that she needed to meet with her new supervisor, Sergeant Thompson (*Id.*, ¶ 39). Ms. Kenney stated that HR had approved her to work from 7:00 a.m. to 3:00 p.m. and that she would not leave (*Id.*). Ms. Kenney admits that she refused to change shifts or meet with her supervisor (*Id.*, ¶ 40).

Chief Carter advised HR of Ms. Kenney's conduct, and Ms. Kenney continued to arrive at work at the old location the following week during which HR remained in communication with Ms. Kenney regarding her accommodation request (*Id.*, ¶ 41). On August 2, 2018, Ms. Kenney emailed Ms. Mayhan stating that she was at work that day and had sent a copy of a reasonable accommodation request due to FMLA and asking whether Ms. Mayhan denied her request and

refused to accommodate her (*Id.*, ¶ 42). Ms. Mayhan responded that she "never said that" and again explained the ADA accommodation process while noting that Ms. Kenney lacked any documentation on file to support her request for a day shift (*Id.*, ¶ 43). Ms. Kenney asserts that her statement claiming that she was on medication preventing her from driving or working at night supported her request for the day shift (*Id.*). Further, Ms. Kenney did not feel she should have to get the required documentation since the University already had other information on file regarding her disability (*Id.*, ¶ 63). Ms. Mayhan explained to Ms. Kenney on several occasions that the processes for obtaining FMLA leave and for requesting an accommodation under the ADA are separate and distinct (*Id.*, ¶ 46). The University's policy on disability accommodation and the appropriate process for making accommodation requests under the ADA plainly state that the employer may seek such information and that once such information is received, the parties will enter into discussions for appropriate accommodation (*Id.*, ¶ 67).

Ms. Mayhan and Ms. Kenney discussed meeting to resolve these issues, but Ms. Kenney stated that "there [was] no need to meet" since Ms. Mayhan was "not approving [her] ADA and FMLA" requests (Dkt. No. 17-3, at 38; 24, ¶ 44). Ms. Kenney testified that this statement did not mean that she was refusing to meet with Ms. Mayhan and that she was still communicating with Ms. Mayhan via email (Dkt. No. 23-2, at 4; 25, ¶ 25). Ms. Kenney further stated that she "already [had] documentations on file concerning [her] FMLA," that she "submitted to [Ms. Mayhan] a reasonable accommodation," that Ms. Mayhan was "the one that [was] rejecting [her] request for a reasonable accommodation," and that she would "file a complaint concerning this issue" (Dkt. No. 17-3, at 38; 24, ¶ 44). In response, Ms. Mayhan acknowledged that Ms. Kenney was requesting to be exempt from working the night shift and to work the day shift instead; reiterated that HR had not received any requested medical documentation supporting that request; noted that

the only medical documentation on file related to Ms. Kenney's lifting restriction from 2014; advised that Ms. Kenney would be expected to report to work as directed by her department without any accommodation in place; claimed that Ms. Kenney had refused to meet with her regarding her allegations and the accommodation process on four separate occasions; and requested that Ms. Kenney contact her by August 3, 2018, if she wanted to move forward with her complaints (Dkt. No. 17-3, at 39; 24, ¶¶ 45, 47-48). Ms. Kenney never contacted Ms. Mayhan about moving forward with her complaints (Dkt. No. 24, ¶ 48). Ms. Kenney also admits that she did not tell anyone at the University that she was trying to obtain medical documentation from her doctor (Dkt. No. 24, ¶ 64).

On August 3, 2018, Lt. Bailey, as Ms. Kenney's direct supervisor at the time, executed a disciplinary notice of termination which provided that Ms. Kenney twice refused to report to her newly assigned shift and to meet with her supervisor, which conduct constituted "intentional disobedience or refusal to carry out reasonable instructions" (*Id.*, ¶ 51). The University maintains that Ms. Kenney's actions merited "for cause" termination under the UALR Code of Conduct for Classified Employees, which is published in the Employee Handbook (*Id.*, ¶ 52). On August 6, 2018, after consultation with Lt. Bailey, Ms. Mayhan, and then-Associate Vice Chancellor of Human Resources Dr. Charles Azebeokhai, Chief Carter recommended that Ms. Kenney be terminated (*Id.*, ¶ 49).

On August 7, 2018, Ms. Kenney requested and received FMLA leave (*Id.*, ¶ 50). There is no evidence that Ms. Kenney told anyone at UALR that the FMLA leave was for the purpose of obtaining the necessary medical certification for her ADA request (*Id.*). Chief Carter intended to meet with Ms. Kenney about the termination on August 7, 2018, but Ms. Kenney notified Chief

Carter that she was taking that day off for FMLA leave (*Id.*, ¶ 53).  Therefore, the meeting was held and her termination date made effective on August 8, 2018 (*Id.*).

Though the University maintains that it gave a legitimate, non-discriminatory reason for firing Ms. Kenney, Ms. Kenney insists that there was a position on the day shift that Chief Carter refused to give to her and gave to Lt. Bailey, a Caucasian male, instead (*Id.*, ¶ 68).  Additionally, Ms. Kenney testified that Caucasian officers nit-picked at her and gave her write-ups and that Chief Carter "had just about the whole department writing [her] up," though she was unable to name the author or provide specifics of these alleged unfair write-ups (Dkt. Nos. 17-1, at 18; 24, ¶ 80).  Further, Ms. Kenney alleges that two officers, one Caucasian and one African-American, harassed and interrogated her, though neither officer took any disciplinary actions against her nor does Ms. Kenney know whether they had any authority to discipline her (Dkt. No. 24, ¶ 81).

Ms. Kenney filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on August 21, 2018, alleging that her termination was due to race, age, and disability discrimination and in retaliation for opposing unlawful practices under those acts (Dkt. Nos. 1, at 13; 24, ¶ 54).  The EEOC was unable to conclude that any violations had occurred and issued a Right to Sue Notice on August 30, 2018 (Dkt. Nos. 1, at 14; 24, ¶ 55).  Ms. Kenney does not allege in her complaint that the University or any of its various departments receive federal funds (Dkt. No. 24, ¶ 58).

## II.    Legal Standard

Summary judgment is appropriate if there is no genuine issue of material fact for trial. *UnitedHealth Group Incorporated v. Executive Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Fed. R. Civ. P. 56).  Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material

fact and that the defendant is entitled to entry of judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In ruling on a motion for summary judgment '[t]he district court must base the determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.'" *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923-24 (8th Cir. 2004) (internal citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Johnson Reg'l Med. Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989) (citation omitted).

However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008), *cert. denied*, 522 U.S. 1048 (1998). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

Importantly, "[t]here is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011)

10

(en banc) (citing *Fercello v. County of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010)). "Although employment discrimination cases are 'often fact intensive and dependent on nuance in the workplace, they are not immune from summary judgment.'" *Trierweiler v. Wells Fargo Bank*, 639 F.3d 456, 459 (8th Cir. 2011) (quoting *Fercello*, 612 F.3d at 1077). "An employer is entitled to judgment as a matter of law if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision." *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1047 (8th Cir. 2002) (internal quotations and citations omitted).

### III. Eleventh Amendment

As an initial matter, the Court addresses the University's argument that it is entitled to summary judgment because the undisputed facts establish that the Board of Trustees for the University of Arkansas is an instrumentality of the State and entitled to Eleventh Amendment immunity on Ms. Kenney's claims brought under the ADA, the ADEA, and the FMLA (Dkt. Nos. 1, ¶¶ 35-56; 17, ¶ 3). Consequently, the University argues that all claims brought under 42 U.S.C. § 1983, the ADA, the ADEA, and the FMLA must be dismissed due to sovereign immunity (Dkt. No. 18, at 9).

#### A. Legal Standard

The Eleventh Amendment presents a jurisdictional bar to any suit that is in actuality directed against the State, whether the action is nominally instituted against the State, a state agency or instrumentality, or a state official. *See, e.g.*, *Fla. Dep't of State v. Treasurer Salvors*, 458 U.S. 670 (1982); *Alabama v. Pugh*, 438 U.S. 781 (1979); *Edelman v. Jordan*, 415 U.S. 651 (1974). Without the State's consent, this jurisdictional bar applies regardless of the nature of the relief sought. *See Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996); *Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993); *Pennhurst State*

11

*School & Hosp. v. Halderman*, 465 U.S. 89, 100-01 (1984).  Ms. Kenney may not seek monetary or injunctive relief against a state entity.  *See Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007).  "Congress may abrogate the States' immunity from suit pursuant to its powers under § 5 of the Fourteenth Amendment," but such abrogation must be "unmistakably clear in the language of the statute."  *Coleman v. Court of Appeals of Md.*, 566 U.S. 30, 35 (2012) (internal quotations and citations omitted).

> ### B.   Analysis

In determining whether Eleventh Amendment immunity applies to a particular entity, this Court must examine the particular entity in question and its powers and characteristics as created by state law to determine whether the suit is in reality a suit against the state.  *See Hadley v. N. Arkansas Cmty. Tech. Coll.*, 76 F.3d 1437, 1439 (8th Cir. 1996).  The sole defendant in this case is the Board of Trustees of the University of Arkansas (Dkt. No. 1).  The Arkansas Supreme Court has recognized that the University is an arm and instrumentality of the State and that a lawsuit against a state university or its board of trustees is a lawsuit against the State barred by the doctrine of sovereign immunity.  *See Univ of Ark. for Med Sciences v. Adams*, 117 S.W.3d 588, 590 (Ark. 2003)*; Grine v. Bd. of Trustees*, 2 S.W.3d 54, 59 (Ark. 1999); *Laney v. Univ. of Ark.*, 407 S.W.2d 916 (Ark. 1966).  Accordingly, the University is immune from suit except when Congress has validly abrogated the State's sovereign immunity.  *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007) ("[T]he Eleventh Amendment bars suit against the University for any kind of relief, not merely monetary damages.").

Ms. Kenney may not sue the University pursuant to 42 U.S.C. § 1983 (Dkt. No. 1, at 1). The University has not waived immunity by consenting to suit, and Congress did not abrogate the states' Eleventh Amendment immunity by enacting § 1983.  *See Quern v. Jordan*, 440 U.S. 332,

342 (1979); *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 890 (8th Cir. 2005); *Burk v. Beene*, 948 F.2d 489, 493 (8th Cir. 1991). Furthermore, only "persons" can be sued under 42 U.S.C. § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989). While under the doctrine set forth in *Ex Parte Young,* 209 U.S. 123 (1908), state officials may be sued in their official capacities for prospective injunctive relief without violating the Eleventh Amendment, the same doctrine does not extend to states or state agencies. *Monroe v. Arkansas State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007); *Pediatric Specialty Care, Inc. v. Ark. Dep't of Human Servs.,* 443 F.3d 1005, 1017 (8th Cir. 2006), *vacated on other grounds,* 551 U.S. 1142 (2007). Since the state and its agencies, including the University, are not "persons" under § 1983, and Ms. Kenney has named no individual defendants, Ms. Kenney's § 1983 claims are barred. *See Ark. Tech Univ. v. Link*, 17 S.W.3d 809 (Ark. 2000). Accordingly, the Court grants summary judgment in favor of the University on Ms. Kenney's § 1983 claims.

Ms. Kenney may not sue the University pursuant to the ADA (Dkt. No. 1, ¶¶ 35-41). Ms. Kenney's claims fall under Title I of the ADA which prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12111(a). Though Congress attempted to abrogate the states' sovereign immunity as to Title I of the ADA, that attempt was found invalid and the states are still immune from suit under Title I of the ADA. *See Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001); *see also Faibisch v. Univ. of Minn.*, 304 F.3d 797, 800 (8th Cir. 2002). In fact, Ms. Kenney has already sued UALR three times under Title I of the ADA, and all three courts correctly held that her ADA claims were barred by sovereign immunity. *See Kenney v. UALR, et. al.*, No. 4:16CV00011 JLH (E.D. Ark. Jan. 14, 2016) (holding that, as an arm of the state, "the

University of Arkansas at Little Rock is immune from suit with respect to [Ms.] Kenney's allegations that arise under the [ADA]"); *Kenney v. University of Arkansas at Little Rock*, No. 4:16CV00659 JM (E.D. Ark. Sept. 14, 2016) (finding UALR "immune from suit with regard to [Ms. Kenney's] [ADA] claims"); *Kenney v. UALR, et. al*, No. 60-CV-16-1524 (Pulaski Cty. Circuit Ct., 9th Div., Oct. 25, 2016). Accordingly, the Court grants summary judgment in favor of the University on Ms. Kenney's ADA claims.

Ms. Kenney may not sue the University pursuant to the ADEA (Dkt. No. 1, ¶¶ 52-56). Congress attempted to abrogate the states' sovereign immunity in the ADEA, but that attempt was found invalid. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 92 (2000) (holding that "the ADEA is not a valid exercise of Congress's power under § 5 of the Fourteenth Amendment" and that "[t]he ADEA's purported abrogation of the States' sovereign immunity is accordingly invalid"). Accordingly, the Court grants summary judgment in favor of the University on Ms. Kenney's ADEA claims.

Finally, Ms. Kenney may not sue the University pursuant to the FMLA (Dkt. No. 1, ¶¶ 42-51). Ms. Kenney's FMLA claims arise under the statute's self-care provision as her FMLA leave requests were for the purpose of taking care of her own serious health condition. *See* 29 U.S.C. § 2612(a)(1)(D) (entitling an employee to leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee"). Congress did not abrogate the States' Eleventh Amendment immunity by enacting the FMLA's self-care provision. *See Coleman*, 566 U.S. 30 at 43-44 (finding that Congress' enactment of the FMLA's self-care provision failed to abrogate the States' immunity from suits for damages); *Keselyak v. Curators of Univ. of Mo.*, 695 Fed. App'x 165, 166 (8th Cir. 2017) (affirming district court's dismissal of complaint based on university's sovereign immunity from suit under the FMLA self-

care provision); *Miles v. Bellfontaine Habilitation Ctr.*, 481 F.3d 1106, 1007 (8th Cir. 2007) (affirming district court's dismissal of plaintiff's FMLA self-care claim since agency of the state was entitled to Eleventh Amendment immunity from that claim). Accordingly, the Court grants summary judgment in favor of the University on Ms. Kenney's FMLA claims.

### IV.    Title VII

Congress validly abrogated states' Eleventh Amendment immunity for Title VII claims. *See Okruhlik v. The Univ. of Ark.*, 255 F.3d 615 (8th Cir. 2001). In support of her Title VII claims, Ms. Kenney asserts that she is a member of a protected class and was required to change shifts when those persons outside of her protected class have not been required to change shifts (Dkt. No. 1, ¶¶ 26, 28). Ms. Kenney also claims that she was harassed based on her race and retaliated against for filing prior EEOC claims against the University alleging disability discrimination in violation of Title VII (*Id.*, ¶¶ 29-30). Further, Ms. Kenney alleges discrimination on the basis of her race because she contends that those outside of her protected class had their ADA requests processed and engaged in the interactive process in accordance with the University's policy to accommodate employees under the ADA (*Id.*, ¶ 31). Ms. Kenney also alleges race-based discrimination because she maintains that those outside of her protected class were allowed to exercise their rights under the FMLA while she was not allowed the time to obtain a medical certification from her physician (*Id.*, ¶ 32). Finally, Ms. Kenney claims that she was retaliated against by the University for protesting that she had been discriminated against in the terms and conditions of her employment (*Id.*, ¶ 33).

The University asserts that it is entitled to summary judgment on Ms. Kenney's racial discrimination claim under Title VII because she cannot establish a *prima facie* case of discrimination as she is unable to establish that anyone similarly situated but outside the protected

class was treated better than she was treated (Dkt. No. 17, ¶ 6). The University further argues that Ms. Kenney cannot demonstrate the University's legitimate, non-discriminatory reasons for its actions against her were pretextual (*Id.*). Additionally, the University maintains that it is entitled to summary judgment on Ms. Kenney's retaliation claim under Title VII because the undisputed facts establish that the University's legitimate, non-discriminatory reason for terminating her had nothing to do with her race or with her allegedly complaining about discrimination (*Id.*, ¶ 7).

The Court addresses Ms. Kenney's Title VII race discrimination and retaliation claims separately.

### A.    Racial Discrimination

#### 1.    Legal Standard

Title VII prohibits an employer from discharging an employee or treating her differently with respect to the terms, conditions, or privileges of her employment because of her race. 42 U.S.C. § 2000e-2(a)(1). A plaintiff's race discrimination claim can survive a motion for summary judgment in one of two ways. *See Humphries v. Pulaski Cty. Sch. Dist.*, 580 F.3d 688, 692 (8th Cir. 2009). First, a plaintiff may present direct evidence that "establishes 'a specific link between the [alleged] discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the employer's decision." *Putman v. Unity Health Sys.*, 348 F.3d 732, 735 (8th Cir. 2003) (quoting *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997)); *see also Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 863 (8th Cir. 2008) (citing *Russell v. City of Kan. City, Mo.*, 414 F.3d 863, 866 (8th Cir. 2005)). Alternatively, a plaintiff "may present evidence 'creating an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas*.'" *Humphries*, 580 F.3d at 692 (quoting *Fields,* 520 F.3d at 863-64). Since Ms. Kenney has not

presented direct evidence of a Title VII violation, the Court will apply the burden-shifting framework established by the United States Supreme Court in *McDonnell Douglas Corporation v. Green*. *See* 411 U.S. 792, 802-04 (1973).

Under the *McDonnell Douglas* framework, Ms. Kenney must show that: (1) she was a member of a protected class; (2) she was meeting her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated differently. *See Humphries*, 580 F.3d at 692 (citing *Fields*, 520 F.3d at 864); *Shanklin v. Fitzgerald*, 397 F.3d 596, 602 (8th Cir. 2005) (citing *Tolen v. Ashcroft,* 377 F.3d 879, 882 (8th Cir. 2004)). If Ms. Kenney "meets her burden to establish a prima facie case of discrimination, the burden then shifts to the [University] 'to establish a legitimate, nondiscriminatory reason for taking the allegedly discriminatory action.'" *Humphries*, 580 F.3d at 692-93 (citing *Hammer v. Ashcroft,* 383 F.3d 722, 724 (8th Cir. 2004)). If the University puts forth such a reason, Ms. Kenney must then show that the University's proffered explanation is pretextual or her claims will fail. *See id.* (citing *Hammer*, 383 F.3d at 724).

Ms. Kenney must prove that she and her alleged comparator or comparators were "similarly situated in all relevant respects." *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000). However, "it is well-established that the threshold of proof necessary to establish a prima facie case is minimal." *Young v. Warner–Jenkinson Co.*, 152 F.3d 1018, 1022 (8th Cir. 1998). The Eighth Circuit has set a "'low threshold' for employees to be considered similarly situated" at the *prima facie* stage, "requiring only that the employees 'are involved in or accused of the same or similar conduct and are disciplined in different ways.'" *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 851 (8th Cir. 2005) (quoting *Wheeler v. Aventis Pharms.*, 360 F.3d 853, 857 (8th Cir. 2004)),

*abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011) (en banc).

If Ms. Kenney satisfies this minimal burden, the burden shifts to the University to articulate a legitimate, nondiscriminatory reason for its actions.   "The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." *Floyd v. State of Mo. Dep't of Soc. Servs., Div. of Family Servs.*, 188 F.3d 932, 936 (8th Cir. 1999).

If the University meets this requirement, Ms. Kenney then must come forward with evidence of pretext.   "A plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 854 (8th Cir. 2012).   The Eighth Circuit has observed that there are at least two routes for demonstrating a material question of fact as to pretext.   *Id.*   "First, a plaintiff may succeed indirectly by showing the proffered explanation has no basis in fact.   Second, a plaintiff can directly persuade the court that a prohibited reason more likely motivated the employer."   *Id.* (internal quotation marks and citation omitted).

To the extent Ms. Kenney intends to rely on comparator evidence at the pretext stage, "[w]here the evidence used to establish a prima facie case meets [a] minimal burden but is not strong, that evidence, standing alone, may be insufficient to sustain the plaintiff's case at the final stage of the burden-shifting analysis." *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007).   This is so in part because "the level of proof required to show causation is less at the prima facie stage than at the final stage of the *McDonnell Douglas* analysis."   *Id.*   At the pretext stage, "'the test for determining whether employees are similarly situated to a plaintiff is a rigorous

one.'" *Bone v. G4S Youth Servs., LLC,* 686 F.3d 948, 956 (8th Cir. 2012) (quoting *Rodgers v. U.S. Bank, N.A.,* 417 F.3d 845, 853 (8th Cir. 2005), *abrogated on other grounds by Torgerson*, 643 F.3d at 1031. Ms. Kenney, to succeed, must show that comparators were "similarly situated in all relevant respects." *Id.* (quoting *Rodgers,* 417 F.3d at 853). That is, the employees "used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Wierman v. Casey's Gen. Stores,* 638 F.3d 984, 994 (8th Cir. 2011) (quoting *Cherry v. Ritenour Sch. Dist.,* 361 F.3d 474, 479 (8th Cir. 2004)). Although the standard for determining whether employees are similarly situated is rigorous at the pretext stage, the Eighth Circuit does not require the plaintiff to produce evidence of "a clone." *Ridout v. JBS USA, LLC,* 716 F.3d 1079, 1085 (8th Cir. 2013). Instead, to be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of comparable seriousness. *Burton v. Arkansas Sec'y of State*, 737 F.3d 1219, 1230–31 (8th Cir. 2013).

### 2. Analysis

Based on the undisputed record evidence, even construing all reasonable inferences in Ms. Kenney's favor, Ms. Kenney fails to demonstrate that similarly situated employees outside the protected class were treated differently. *See Humphries*, 580 F.3d at 692 (citing *Fields*, 520 F.3d at 864). Even if the Court assumes for purposes of resolving this motion only that Ms. Kenney meets her minimal burden of establishing a *prima facie* case, she fails to meet the rigorous burden imposed on comparator evidence at the pretext stage.

Though Ms. Kenney's complaint alleges that other employees outside of her protected class received preferential treatment, her claims are general and non-specific (Dkt. No. 1, ¶¶ 28, 30-32). Ms. Kenney presents no record evidence of similarly situated employees receiving preferential

19

treatment.  At her deposition, Ms. Kenney was asked whether she claimed there were Caucasian employees who were treated differently than she was treated (Dkt. No. 17-1, at 18).  She replied, "Well, I cannot answer that.  And the reason why I cannot answer because there was segregation among the employees, which I was isolated from all the other UALR employees." (*Id.*).  Ms. Kenney testified that she was written up by Caucasian officers but stated that she had no knowledge about whether any Caucasian employees were ever written up or disciplined (*Id.*, at 18, 21).  Ms. Kenney testified that Chief Carter refused to give her job assignments but gave job assignments to all other employees in the department—25 or so total employees, both Caucasian and non-Caucasian—showing that Caucasian and non-Caucasian employees were treated similarly in this regard (Dkt. No. 17-1, at 19; 18, at 28).  Ms. Kenney initially testified that she was the only employee excluded from the work schedule as further evidence that she never received work assignments, but she later testified that at least four other employees were also excluded from the work schedule (Dkt. No. 17-1, at 34-35).  At no point in her deposition or in any other record evidence has she identified a legally sufficient comparator.

Ms. Kenney does argue that there was a position on the day shift that Chief Carter refused to give to her and instead gave to Lt. Bailey, a Caucasian male (Dkt. No. 24, ¶ 68).  Regardless of the merits of this argument, Ms. Kenney and Lt. Bailey were not "similarly situated in all relevant aspects" because Lt. Bailey was Ms. Kenney's supervisor at the time (*Id.*, ¶ 51).  *See Beasley v. Warren Unilube, Inc.*, 933 F.3d 932, 938 (8th Cir. 2019) (finding, in part, that employees are similarly situated when they "share[] the same supervisor, were subject to the same standards, or engaged in the same conduct").  Thus, Lt. Bailey cannot serve as a comparator for Ms. Kenney.

Given her inability to identify a legally sufficient comparator, Ms. Kenney cannot establish that similarly situated employees outside of her protected class were treated differently.  Ms.

Kenney's race discrimination claims fail.  Accordingly, the Court grants summary judgment in favor of the University on Ms. Kenney's race discrimination claims under Title VII.

### B.  Retaliation

#### 1.  Legal Standard

"Title VII forbids an employer from 'discriminat[ing] against any of his employees . . . because [an employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].'" *Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 818 (8th Cir. 2017) (quoting 42 U.S.C.§ 2000e-3(a)).  To establish a retaliation claim under Title VII, "a plaintiff must first establish a prima facie case by showing that he or she: '(1) engaged in statutorily protected activity; (2) he [or she] suffered an adverse employment action, and (3) there was a causal connection between the adverse employment action and the protected activity.'" *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 880 (8th Cir. 2005) (quoting *E.E.O.C. v. Kohler Co.*, 335 F.3d 766, 772 (8th Cir. 2003)).  "[T]he threshold of proof necessary to establish a *prima facie* case is minimal." *Young v. Warner-Jenkinson Co., Inc.*, 152 F.3d 1018, 1022 (8th Cir. 1998) (citations omitted).  "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 339 (2013).  "Even at summary judgment, '[a] plaintiff can establish a causal connection between his complaints and an adverse action through circumstantial evidence, such as the timing of the two events.'" *Wilson v. Ark. Dep't of Human Servs.*, 850 F.3d 368, 373 (8th Cir. 2017) (quoting *Turner v. Gonzales*, 421 F.3d 688, 696-97 (8th Cir. 2005)).  However, "[g]enerally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation."

*Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 761 (8th Cir. 2004) (quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc)).

### 2.    Analysis

Ms. Kenney fails to make a *prima facie* showing of retaliation in violation of Title VII. The Court acknowledges that Ms. Kenney has previously engaged in statutorily protected activity by filing EEOC charges, including two charges in 2014, one charge in 2015, and one charge in 2018 (Dkt. Nos. 1, at 13; 18, at 5 n.2).[3]  The Court also acknowledges that Ms. Kenney alleges at least one actionable adverse employment action in the form of her termination.  *See Wallace v. Sparks Health System*, 415 F.3d 853, 858 (8th Cir. 2005) (finding it "undisputed" that an employee's discharge constitutes an adverse employment action).  However, Ms. Kenney fails to establish the requisite causal connection between her protected activity and her termination.

Almost three years elapsed between Ms. Kenney's 2015 EEOC charge and her termination on August 8, 2018 (Dkt. Nos. 18, at 5 n.2; 24, ¶ 53).  This three-year gap belies any plausible causal connection between these complaints and Ms. Kenney's termination.  Further, Ms. Kenney filed her most recent EEOC charge on August 21, 2018, *in response to and after* her termination (Dkt. Nos. 1, at 13; 24, ¶ 54).  Ms. Kenney identifies no other statutorily-protected activity for which the University might have retaliated against her by firing her.

Ms. Kenney alleges that she was fired in retaliation for taking FMLA leave on August 7, 2018 (Dkt. No. 23-1, at 6).  This allegation appears to support Ms. Kenney's claim that she was

---

[3]  Ms. Kenney filed an EEOC charge on September 26, 2014, alleging that she was not accommodated with a lifting restriction as a custodial worker (Dkt. No. 18, at 5 n.2).  At that time, she was transferred to a job in the police department with no lifting requirement (*Id.*).  On December 29, 2014, Ms. Kenney filed an EEOC charge for an invoice she received for taking classes, claiming retaliation for the earlier EEOC charge (*Id.*).  On October 30, 2015, Ms. Kenney filed an EEOC charge alleging that she was denied training and job instructions due to her disability (*Id.*).  The EEOC did not find a violation based on any of Ms. Kenney's charges.

retaliated against in violation of the ADA and the RA rather than Ms. Kenney's Title VII retaliation claims (*Id.*).  However, to the extent Ms. Kenney alleges that she was retaliatorily fired for taking FMLA leave in violation of Title VII, the record evidence demonstrates otherwise (Dkt. No. 24, ¶¶ 49, 51, 53).  Ms. Kenney admits, and the undisputed record evidence supports, that the decision to fire her was made prior to Ms. Kenney's notifying Chief Carter of her intent to take FMLA leave on August 7, 2018 (*Id.*).  Further, Ms. Kenney took FMLA leave on August 7, 2018, and Chief Carter met with her the following day August 8, 2018, on Ms. Kenney's return.

Ms. Kenney complains about other actions taken by the University, which the University maintains do not qualify as actionable adverse employment actions sufficient to state a retaliation claim.  Even if the Court considered some of these actions about which Ms. Kenney complains to be sufficient adverse employment action to state a claim, none of these actions occurred in close enough proximity to Ms. Kenney's statutorily-protected activity to demonstrate a causal connection.  The earliest action about which Ms. Kenney complains was her move to Stabler Hall sometime in the Fall of 2016, roughly a year after Ms. Kenney's October 30, 2015, EEOC complaint (Dkt. Nos. 18, at 5 n.2; 24, ¶¶ 25, 77).  As such, the record evidence demonstrates no causal connection between Ms. Kenney's statutorily-protected activity and her allegations of retaliation.

Accordingly, the Court grants summary judgment on Ms. Kenney's retaliation claims under Title VII.

### V.     RA

Because the Court has already granted summary judgment on Ms. Kenney's ADA claims, the Court will only consider Ms. Kenney's disability discrimination and retaliation claims under the RA.  Ms. Kenney claims that the University discriminated against her by refusing to

accommodate reasonably her disability, by harassing and retaliating against her, by creating a hostile environment, and by terminating her because of her disability in violation of the ADA and the RA (Dkt. No. 1, ¶ 39).  Ms. Kenney alleges that the University engaged in retaliatory conduct against her when she attempted to exercise her rights under the ADA (*Id.*).  Finally, Ms. Kenney asserts that her disability, record of disability, and/or perceived disability made a difference in the University's decision to harass her and terminate her employment (*Id.*, ¶ 40).

The University maintains that it is entitled to summary judgment on Ms. Kenney's RA claims because she fails to allege that the department for which she worked received federal aid (*Id.*, ¶ 4).  On the merits, the University claims that, based on the undisputed record evidence, Ms. Kenney cannot establish a *prima facie* case of discrimination and cannot demonstrate that the University's legitimate, non-discriminatory reasons for its actions against her were pretextual (*Id.*).  Finally, the University claims that it is entitled to summary judgment on Ms. Kenney's retaliation claim under the RA because the undisputed record evidence establishes that the University's legitimate, non-discriminatory reasons for terminating her had nothing to do with her disability or with her allegedly complaining about discrimination (*Id.*, ¶ 5).

### A.    Legal Standard

The RA prohibits "any program or activity" that receives federal financial assistance from discriminating against a qualified individual with a disability solely because of her disability.  *Jim C. v. United States*, 235 F.3d 1079, 1080 (8th Cir. 2000) (citing 29 U.S.C. § 794(a)).  The statute, in relevant part, defines "program or activity" as:  "(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or . . . (2)(A) a college, university, or other postsecondary institution, or a public system of higher education."  29 U.S.C. § 794(b).  Under this definition, the State itself as a whole is not a program or activity.  Rather,

"only the department or agency which receives [or distributes] the aid is covered." *Klinger v. Dep't of Corr.*, 107 F.3d 609, 615 (8th Cir. 1997).  The acceptance of funds by one state agency therefore leaves unaffected both other state agencies and the State as a whole.  The RA requires States that accept federal funds to waive their Eleventh Amendment immunity to suits brought in federal court for violations of Section 504.  *Jim C.*, 235 F.3d at 1081 (citing 42 U.S.C § 2000d–7).  Because Section 504 covers only the individual agency or department that accepts or distributes federal funds, this waiver requirement is limited in the same way.  *Id*.  By accepting funds offered to an agency, the State waives its immunity only with regard to the individual agency that receives the funds.  A State and its instrumentalities can avoid Section 504's waiver requirement on a piecemeal basis by simply accepting federal funds for some departments and declining them for others.  *Id*.  The State is not required to renounce all federal funding to shield chosen state agencies from compliance with Section 504.  *Id*.

Though the Court has granted summary judgment on Ms. Kenney's ADA claims, the Court notes that "[t]he ADA and the RA are 'similar in substance' and, with the exception of the RA's federal funding requirement, 'cases interpreting either are applicable and interchangeable.'" *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999) (quoting *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998)); *see also Durand v. Fairview Health Servs.*, 902 F.3d 836, 841 (8th Cir. 2018) (same); *Allison v. Dep't of Corr.*, 94 F.3d 494, 497 (8th Cir. 1996) (noting that "the same basic standards and definitions are used under both Acts").

### B.    Analysis

As an initial matter, Ms. Kenney fails to allege that the University receives federal financial funding.  More specifically, Ms. Kenney has not alleged that the UALR police department where she worked received federal funds or even that UALR, the campus at which she was employed,

received federal funds.  Because she has failed to allege sufficient facts to give rise to a claim under the RA, Ms. Kenney's RA claim fails.

Even if this Court were to find that Ms. Kenney alleged sufficient facts to show that the UALR police department received federal funding, she has failed to state a *prima facie* case of liability under the RA.  The University does not contest that Ms. Kenney is "disabled" as defined by the RA (Dkt. No. 26, at 2).  Instead, the University contends that Ms. Kenney has failed to bring proper claims for failure to accommodate her disability, hostile work environment because of her disability, and retaliation for engaging in protected activity related to her disability.  The Court will discuss these claims in turn.

### 1.  Failure To Accommodate

"In a reasonable accommodation case, the 'discrimination' is framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations." *Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004).  As the Eighth Circuit has held, an employer commits unlawful discrimination if the employer does not make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer. *See Ballard v. Rubin*, 284 F.3d 957, 960 (8th Cir. 2002); *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 951 (8th Cir. 1999) (quoting 42 U.S.C. § 12112(b)(5)(a)).  "A reasonable accommodation should provide the disabled individual an equal employment opportunity, including an opportunity to attain the same level of performance, benefits, and privileges that is available to similarly situated employees who are not disabled." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc) (citation omitted).  "To determine the appropriate

reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3).   With a reasonable accommodation claim, "the employer's intent is not determinative." *Withers v. Johnson*, 763 F.3d 998, 1004 (8th Cir. 2014).  "Rather, discrimination occurs when the employer fails to abide by a legally imposed duty." *Peebles*, 354 F.3d at 767.

Reasonable accommodation claims do not fall under the *McDonnell Douglas* burden-shifting analysis.  *See Peebles*, 354 F.3d at 767.  Instead, "the plaintiff's burden, upon a defendant's motion for summary judgment, is only to show that the requested accommodation is 'reasonable on its face, i.e., ordinarily or in the run of cases.'"  *Id.* at 768 (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002)).  "Upon such a showing, the employer is left to 'show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances.'"  *Id.* (quoting *Barnett*, 535 U.S. at 402).  In practice, the Eighth Circuit has articulated a four-part test for evaluating these claims, under which the plaintiff must demonstrate:  "(1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Ballard*, 284 F.3d at 960 (internal quotations and citations omitted).

The Eighth Circuit "has established a shared responsibility between employers and employees to resolve accommodation requests. A disabled employee must initiate the accommodation-seeking process by making his employer aware of the need for an accommodation*." E.E.O.C. v. Convergys Customer Mgmt. Grp., Inc.*, 491 F.3d 790, 795 (8th Cir. 2007) (citing *Cannice v. Norwest Bank Iowa N.A.*, 189 F.3d 723, 726 (8th Cir. 1999)).

"Additionally, the employee must provide relevant details of his disability and, if not obvious, the reason that his disability requires an accommodation." *Id.* (citing *Miller v. Nat'l Cas. Co.*, 61 F.3d 627, 630 (8th Cir. 1995)). Such relevant details include the applicable medical records or restrictions underlying the employee's requested accommodation. *See Brunckhorst v. City of Oak Park Heights*, 914 F.3d 1177, 1183 (8th Cir. 2019).

Ms. Kenney primarily contends that the University failed to accommodate her reasonably by denying her the opportunity to work the day shift due to the alleged side effect of the medication she took which prevented her from driving at night or working the evening shift (Dkt. No. 23-1, at 3, 6). Ms. Kenney states that she did not feel that she should have to get the required medical certificate because the University already had other information on file regarding her disability (*Id.*, at 3). Ms. Kenney alleges that she "could not even get a meeting for an interactive process to occur" and that Ms. Mayhan "refused to meet with her until she got a certification from her doctor" (*Id.*, at 6).

The record evidence supports the University's position and instead shows that Ms. Kenney did not receive her desired accommodation due to her own actions. Ms. Kenney was notified on July 11, 2018, that her shift hours and work location would change effective August 1, 2018 (Dkt. No. 24, ¶ 30). Ms. Mayhan directed Ms. Kenney that she would need to follow the appropriate process for requesting an accommodation of working only a day shift and communicated to her that the University lacked the appropriate documentation on file to support her request to switch to a day shift (*Id.*, ¶¶ 34-35, 43). Ms. Kenney did submit an ADA accommodation request form, and Ms. Mayhan responded and requested that Ms. Kenney submit the appropriate medical certification form as provided in the University's policy on disability accommodation (Dkt. Nos. 17-3, at 54-56; 24, ¶ 35). Ms. Kenney was advised that once she submitted the required medical

documentation that the ADA Coordinator and Ms. Kenney would discuss the essential job functions and her specific abilities and limitations (Dkt. No. 1, ¶ 14).

Ms. Mayhan needed additional medical documentation because the last information on file for Ms. Kenney documenting the need for an accommodation, over and above the intermittent FMLA leave Ms. Kenney received for flare-ups of her back and knee pain, related to Ms. Kenney's 2014 injury from taking out the trash and her attendant lifting restriction (Dkt. No. 24, ¶¶ 3-6, 12-13). None of this documentation related to any kind of restriction on working evening shifts (*Id.*, ¶¶ 12-13). Further, in response to being told what documentation was needed to receive this accommodation, Ms. Kenney flatly stated that she "already [had] documentation on file concerning [her] FMLA, and there [was] really no need to [meet]" as a result (Dkt. No. 17-3, at 38). Ms. Mayhan explained to Ms. Kenney *via* email that the University did "not have any medical documentation on file to support the need for [her] request" to work the day shift, "including what [was] in [her] FMLA file," and that without the appropriate medical documentation the requested accommodation would not be in place (*Id.*, at 39). Ms. Mayhan made several attempts to meet with Ms. Kenney to discuss these issues, but Ms. Kenney appears to have refused to meet with her (*Id.*).

Given this record evidence, even drawing all reasonable inferences in favor of Ms. Kenney, the Court determines that Ms. Kenney was not reasonably accommodated due to her own actions rather than any wrongdoing by the University. The undisputed record evidence demonstrates that the University made good-faith efforts to engage in the interactive process with Ms. Kenney and communicated clearly what Ms. Kenney needed to submit to support her request for the desired reasonable accommodation, but Ms. Kenney failed to engage properly in the interactive process.

Accordingly, the Court grants summary judgment in favor of the University on Ms. Kenney's reasonable accommodation claims under the RA.

### 2.      Hostile Work Environment

"To prevail on a hostile work environment claim under the [RA], [a plaintiff] must show 'that he is a member of the class of people protected by the statute, that he was subject to unwelcome harassment, that the harassment resulted from his membership in the protected class, and that the harassment was severe enough to affect the terms, conditions, or privileges of his employment.'" *Ryan v. Capital Contractors, Inc.*, 679 F.3d 772, 778 (8th Cir. 2012) (citing *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 720 (8th Cir. 2003)). "A hostile work environment must be both subjectively and objectively offensive, as well as 'extreme in nature and not merely rude or unpleasant.'" *Id.* at 779 (quoting *Sutherland v. Mo. Dep't of Corr.*, 580 F.3d 748, 751 (8th Cir. 2009)). "In determining whether a plaintiff has demonstrated a hostile work environment, we consider the totality of the circumstances, including the frequency and severity of the conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the plaintiff's job performance." *Cross v. Prairie Meadows Racetrack & Casino, Inc.*, 615 F.3d 977, 981 (8th Cir. 2010) (citing *Rhenieck v. Hutchinson Tech., Inc.*, 261 F.3d 751, 757 (8th Cir. 2001)).

Ms. Kenney alleges that she was subjected to a hostile environment and harassed in violation of the ADA and the RA (Dkt. No. 1, ¶¶ 39-40). Even assuming that Ms. Kenney was subject to unwelcome harassment, Ms. Kenney presents no record evidence that such harassment stemmed from her disability of knee pain or back pain or from some other disability. Ms. Kenney also fails to show how such alleged harassment was severe enough to affect the terms, conditions, or privileges of her employment. Ms. Kenney fails to substantiate her hostile environment and harassment claims with sufficient record evidence.

Accordingly, the Court grants summary judgment in favor of the University on Ms. Kenney's hostile work environment claims under the RA.

### 3.    Retaliation

The Eighth Circuit has recognized a cause of action for retaliation under the RA.  *See Hill v. Walker*, 737 F.3d 1209, 1218 (8th Cir. 2013); *Neudecker v. Boisclair Corp.*, 351 F.3d 361, 363-64 (8th Cir. 2003); *Hoyt v. St. Mary's Rehab Ctr.*, 711 F.2d 864, 867 (8th Cir. 1983).  "To establish unlawful retaliation under the [RA], [a plaintiff] must show that (1) she engaged in a statutorily protected activity, (2) the employer took an adverse action against her, and (3) there was a causal connection between the adverse action and the protected activity." *Hill*, 737 F.3d at 1218 (citing *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1025 (8th Cir. 1999)).  Further, the Eighth Circuit "has held that a person who is terminated after making a goodfaith request for an accommodation may pursue a retaliation claim under the . . . [RA]." *Withers*, 763 F.3d at 1004 (citing *Hill*, 737 F.3d at 1218).  However, "[a] retaliation claim under the [RA] requires a but-for causal connection between the employee's assertion of her [RA] rights and an adverse action by the employer." *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 758 (8th Cir. 2016) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)).  If a plaintiff makes this *prima facie* showing, then the Court proceeds with the familiar burden-shifting *McDonell Douglas* framework for analyzing this claim. *See Hill*, 737 F.3d at 1218.

Generally, Ms. Kenney asserts that "there was nothing but retaliation discrimination within the University department" once she was diagnosed with a disability whereas "before [she] had the disability, there was nothing" (*Id.*).  Ms. Kenney alleges that she was retaliated against based on the following actions:  (1) she was reassigned to Stabler Hall and given "nothing to do" in the way of job assignments; (2) two Caucasian women and Chief Carter told her to move her car from

the front of Stabler Hall even though Chief Carter had told her she could park there; (3) two Caucasian officers, Detective Sharon Houlette and Rodney Burns, investigated her at her desk concerning something that happened off campus; (4) a Caucasian officer named Richard wrote her up; and (5) she was retaliatorily terminated for taking FMLA leave due to her disability (Dkt. No. 23-1, at 5-6).

Of these allegations, only Ms. Kenney's claim that she was retaliatorily terminated for taking leave due to her disability warrants consideration. The other actions about which she complains do not qualify as actionable adverse employment actions. "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage. This might include termination, cuts in pay or benefits, and changes that affect an employee's future career prospects." *Clegg v. Ark. Dep't of Corr.,* 496 F.3d 922, 926 (8th Cir. 2007) (internal marks and quotations omitted). "'Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not' rise to the level of an adverse employment action." *Clegg,* 496 F.3d at 926 (quoting *Higgins v. Gonzales,* 481 F.3d 578, 584 (8th Cir. 2007) *(abrogated on other grounds* by *Torgerson v. City of Rochester,* 643 F.3d 1031, 1058 (8th Cir. 2011))).

Ms. Kenney provides no record evidence, absent temporal proximity, to establish that her termination was causally linked to her protected conduct. Even the temporal proximity between Ms. Kenney's leave and termination is belied by the actual chain of events. Ms. Kenney admits that the decision to fire her was made prior to her notifying Chief Carter of her intent to take FMLA leave on August 7, 2018 (Dkt. No. 24, ¶¶ 49, 51, 53). This admission undercuts any claim that Ms. Kenney was retaliatorily fired for conduct protected by the RA. This sequence of events undercuts causation and dooms Ms. Kenney's claim.

Accordingly, the Court grants summary judgment in favor of the University on Ms. Kenney's retaliation claims under the RA.

## VI.    Pending Discovery Motion

The Court denies Ms. Kenney's pending motion for extension of time to complete discovery related to her medical records (Dkt. No. 15).  On July 11, 2019, the University served discovery requests on Ms. Kenney, specifically requesting that she execute an Authorization for Release of Health Information form to permit the University to obtain her medical records (Dkt. No. 9-1, Request for Production No. 9).  The University filed a motion to compel Ms. Kenney to respond fully to these discovery requests on October 21, 2019 (Dkt. No. 9).  The Court conducted a hearing on the motion to compel on November 1, 2019 (Dkt. Nos. 12, 13).  The Court entered a written Order granting the motion to compel on November 1, 2019 (Dkt. No. 14).

On November 4, 2019, Ms. Kenney filed her pending motion for extension of time to complete discovery related to her medical records (Dkt. No. 15).  In response, the University objected to Ms. Kenney's motion for extension of time, asserting that the University requested the medical records to prepare for trial but had an independent basis for seeking summary judgment that did not depend on Ms. Kenney's medical records.  On November 20, 2019, the University filed its pending motion for summary judgment (Dkt. No. 17).  Ms. Kenney responded to the motion (Dkt. No. 23).  Ms. Kenney did not assert that she needed additional discovery to respond to the motion for summary judgment, that her medical records were necessary to respond to the motion for summary judgment, or that the depositions of medical providers she references in her motion for extension of time were necessary to respond to the motion for summary judgment.  *See* Fed. R. Civ. P. 56(d).  In fact, in her motion, Ms. Kenney represents essentially that the extended deadline would permit her to produce medical records "to establish a baseline for her physical and

emotional health since her termination from employment." (Dkt. No. 15, ¶ 5).  In other words, such records appear to relate to the issue of damages only, not to pertain to liability issues raised by the University in its motion.

Having reviewed the University and Ms. Kenney's arguments with respect to summary judgment, and having considered Ms. Kenney's motion for an extension of time to complete discovery related to her medical records, the Court denies Ms. Kenney's motion for an extension of time to complete discovery related to her medical records (Dkt. No. 15).

**VII.    Conclusion**

For the foregoing reasons, the Court denies Ms. Kenney's motion for an extension of time to complete discovery related to her medical records (Dkt. No. 15).  The Court grants the University's motion for summary judgment on Ms. Kenney's Title VII, § 1983, ADA, RA, ADEA, and FMLA claims (Dkt. No. 17).  The Court denies Ms. Kenney the relief she seeks, and her claims are dismissed with prejudice.  Judgment will be entered accordingly.

It is so ordered, this 30th day of October, 2020.

Kristine G. Baker
United States District Judge